In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3681

CARMEN CONSOLINO,

*Plaintiff-Appellant,*

*v.*

BRIAN TOWNE, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-05526 — **John Z. Lee**, *Judge.*

ARGUED SEPTEMBER 6, 2017 — DECIDED OCTOBER 2, 2017

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* Carmen Consolino, an employee of the Cook County Sheriff's Office, sued Sheriff Thomas Dart, Chief of Staff Brian Towne and Compliance Officer Robert Egan for retaliation based on speech, in violation of 42 U.S.C.

§ 1983. The district court granted summary judgment in favor of the defendants and we affirm.

## I.

Consolino works for the Sheriff's Office as a correctional officer at the Cook County Department of Corrections. He is also a Marine Reservist who serves as a human intelligence and counterintelligence specialist. Beginning in 1999, Consolino was assigned to the Corrections Department's Boot Camp, an alternative sentencing program that offers military-style structure, education, and counseling for non-violent inmates. Consolino's wife, Jennifer Trzos, also worked at the Boot Camp, as an administrative assistant. Trzos filed a *Shakman* complaint against the Sheriff's Office that went to arbitration in January 2012. *Shakman* refers to a series of consent decrees entered in an Illinois case challenging government employment practices based on political affiliation. Named for Michael Shakman, the plaintiff in the original case, *Shakman* consent decrees were entered in 1972 and 1983 that govern claims related to patronage practices in city and county government employment decisions. *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 847–51 (7th Cir. 2005) (explaining generally the history of the *Shakman* consent decrees). Those consent decrees preclude the city and county from, among other things, conditioning employment decisions (including hiring, firing, promotions, recalls from layoffs and transfers) on any political affiliation or political activity, except in the case of certain "exempt positions." *Bonnstetter v. City of Chicago*, 811 F.3d 969, 971 (7th Cir. 2016). Trzos asserted in her *Shakman* complaint that she had been transferred for political reasons.

Consolino testified on behalf of his wife at her *Shakman* arbitration hearing, and the arbitrator ultimately denied her claims. Around the same time that Consolino was testifying on his wife's behalf, he was also attempting to gain a two-year assignment to the FBI's Joint Terrorism Task Force. The Sheriff's Office sometimes assigns an employee to work with the FBI. In those instances, the County continues to pay the employee's salary during the two-year term, and the employee later returns with newly-acquired skills that are valuable to the Sheriff's Office. In the typical case, the FBI requests from the Sheriff's Office a list of candidates to serve on an FBI task force. The FBI then conducts background checks in order to determine whether to accept any of the proposed employees. Consolino disputes that there was a protocol at the Sheriff's Office requiring a request to come from the FBI, but that dispute is immaterial to the outcome here.

Consolino learned from a friend at the FBI, Special Agent Davis Christy, that an FBI task force position formerly filled by a Sheriff's Office employee was open. Christy was Consolino's "Officer in Charge" in the Marine Reserves and also a friend. When Consolino expressed interest in the assignment, Christy spoke to a supervisor at the FBI regarding the possibility of Consolino joining the FBI task force. That supervisor, in turn, told Ricardo Pagan, head of the FBI's Human Intelligence Branch in Chicago, that Consolino was approved by the County and the Sheriff to join the task force. Based on that mistaken belief, the FBI sent a letter to the Sheriff specifically requesting that Consolino be assigned to the FBI's task force. Consolino, by virtue of his experience in the Marine Reserves,

possessed skills sought by the FBI and also held a security clearance that made him an attractive candidate for the FBI.

The Sheriff's Office took no action on the FBI's letter, and when Sheriff Dart visited the boot camp, Consolino took the opportunity to ask Dart in person about the status of the FBI's request. Dart directed him to talk to his supervisor. Consolino then contacted Egan to determine how to proceed. Egan spoke to Joseph Ways, a Sheriff's Office employee who formerly worked at the FBI. Ways contacted Pagan, and it became apparent during their conversation that Consolino had not been pre-approved for the transfer by the Sheriff's Office. There is some disagreement regarding what happened next, but, as before, it is not material to the outcome here. No one disputes that, after his conversation with Pagan, Ways told Egan that the FBI had rescinded its offer because Consolino had failed to follow protocol. Egan then passed that message along to Consolino.

Consolino, in turn, sent an email to Dart and Towne, explaining that he had checked with the FBI and that the request had not been rescinded. Consolino requested clarification. When neither Dart nor Towne responded to that email, Consolino filed a complaint against Ways and Egan with the Office of Professional Review, a department within the Sheriff's Office that investigates allegations of misconduct made against Sheriff's Office employees. Consolino alleged that the Sheriff's Office had failed to assign him to the FBI post because he had testified against the Sheriff's Office at his wife's *Shakman* hearing. Because Ways worked for the Office of Professional Review and because Egan worked for the Compliance Office, Consolino did not wish for either entity to conduct

an investigation into his allegations. A Cook County Assistant State's Attorney ultimately conducted the review and concluded that Consolino's complaint was not well-founded. Seven months after filing his complaint against Ways and Egan, and two months before the complaint was resolved against him, Consolino was reassigned from the Boot Camp to Division XI of the Cook County Jail.[1]

Consolino then filed suit against Dart, Towne and Egan, alleging that they retaliated against him for engaging in speech protected by the First Amendment. In particular, he asserted that he was denied an opportunity to work on the FBI task force because he testified in his wife's *Shakman* hearing, and that he was transferred out of Boot Camp to Division XI because he filed a grievance with the Office of Professional Review. The district court granted summary judgment in favor of the defendants and Consolino appeals.

## II.

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Consolino and construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate when there

---

[1] According to the Sheriff's Office website, Division XI, a part of the County's jail system, is "a state of the art 640,000 square foot, medium-security facility. Consisting of [a] central core surrounded by four housing PODS, Division XI can house 1,536 male detainees." *See* http://www.cookcountysheriff.org/doc/doc_DivisionsOfJail.html (last visited October 2, 2017).

are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson*, 477 U.S. at 256; *Yahnke*, 823 F.3d at 1070. To make out a *prima facie* claim for a violation of First Amendment rights, Consolino, a public employee, must present evidence that (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions. *Yahnke*, 823 F.3d at 1070; *Greene v. Doruff*, 660 F.3d 975, 977–79 (7th Cir. 2011); *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). "[I]n proving a First Amendment claim, the initial burden is on the plaintiff to demonstrate that his conduct was constitutionally protected and that his conduct was a substantial or motivating factor in the defendant's action against him. The burden then shifts to the defendant to show that it would have taken the same action even in the absence of the protected conduct." *Yahnke*, 823 F.3d at 1070–71 (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

On appeal, Consolino contends that the court should have found that the evidence was sufficient to demonstrate that his testimony at his wife's *Shakman* hearing was a motivating factor in denying him the FBI post. He maintains that he presented sufficient evidence to demonstrate that the defendants were aware of his testimony. He argues that the court should have struck Towne's affidavit denying knowledge of his *Shakman* testimony because it conflicted with his earlier deposition testimony. Moreover, he asserts, the district court drew an improper inference that the defendants lacked knowledge of his testimony because he and his wife have different last names. Finally, he contends that he presented

sufficient evidence supporting his claim that his transfer from Boot Camp to Division XI was motivated by retaliation for the grievance he filed with the Office of Professional Review.

For the claim of retaliation based on the *Shakman* testimony, the district court rested its judgment in favor of the defendants on its conclusion that Consolino lacked any evidence that Dart or Towne knew about Consolino's testimony, and on its determination that there was no evidence that Egan was personally involved in any decision to deny Consolino's assignment to the FBI task force. The court rejected Consolino's claim that the transfer from the Boot Camp to Division XI was retaliatory because he failed to produce any evidence that any of the defendants were personally involved in the transfer decision.

We begin with Consolino's contention that he produced sufficient evidence that his *Shakman* testimony was a motivating factor in denying him the FBI task force assignment. In order to demonstrate that a defendant was motivated to retaliate based on protected speech, the plaintiff must first produce evidence that the defendant knew about the protected speech. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity). Dart and Towne both denied any knowledge that Consolino had testified at his wife's arbitration. Consolino's sole support for the proposition that Sheriff Dart knew about his *Shakman* testimony is Consolino's own affidavit. In the affidavit, Consolino baldly declared that, "A reasonable person would expect that the Sheriff would know the cases in which he has been accused of a Shackman [sic]

violation. Such an accusation is not an everyday occurrence. Furthermore, Dart had knowledge because I emailed him, telling him (Ex. 8)." R. 87, at 9. We will address the email in a moment, but the affidavit itself presented no evidence regarding Dart's knowledge. Consolino cites no evidence in the record to support how often *Shakman* complaints are filed against the Sheriff, or whether the Sheriff is generally informed about such complaints or was specifically informed in this case. The affidavit presents nothing more than sheer speculation, and speculation is not enough to create a genuine issue of fact for the purposes of summary judgment. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion).

The email that Consolino mentioned in his affidavit is a memo that he sent to Towne and Dart asking for clarification regarding the FBI's request to have him assigned to the Joint Terrorism Task Force. In the memo, Consolino stated that the FBI hand-delivered to the Sheriff a request to have Consolino detailed to the task force, and that the FBI had asked him on numerous occasions about the delay in the assignment. He explained that he had contacted Egan "to ascertain if there was any violation of … the Shakman Decree that may be holding up the process." R. 87, at 157. After checking into the situation, he asserted, Egan told him that the FBI had rescinded its request. Consolino explained that he then contacted an individual at the FBI, who told him that the organization had not rescinded the request. Consolino closed the memo by asking for "official clarification" regarding whether he would be detailed to the FBI, and if not, the basis for the denial.

Nothing in the emailed memo referred to Trzos's *Shakman* arbitration or Consolino's testimony at that arbitration. At most, Consolino inquired whether the *Shakman* decree was holding up *his own* assignment to the FBI task force. No reasonable inference can be drawn from this memo that Dart or Towne were aware that Consolino testified at his wife's *Shakman* hearing.

Consolino also contends that the court should not have credited Towne's statement that he was not aware of Consolino's *Shakman* testimony. The court should have stricken Towne's summary judgment affidavit, Consolino argues, because it was contrary to Towne's earlier deposition testimony. The only part of Towne's affidavit on which the court relied was Towne's denial of any knowledge about Consolino's testimony at the *Shakman* hearing. But that denial is not inconsistent with any part of Towne's depostion testimony and so the district court was correct to credit the affidavit. *See Castro v. DeVry University, Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact).

In response to Towne's denial of any knowledge about the *Shakman* testimony, Consolino again cites his own speculation that Towne must have known because of his position in the office, and because of Consolino's email to Dart and Towne asking for clarification. As explained above, however, speculation will not defeat a summary judgment motion, and there is no mention of Consolino's *Shakman* testimony in the email

requesting confirmation. Consolino also cites Towne's resume[2] and a document that purportedly shows that Towne was second in command at the Sheriff's Office. The document is a printout of a page from the Sheriff's Office website that lists administrative staff, including an Executive Director and Chief of Staff, as well as other employees. Although this document could be construed as evidence that the Chief of Staff was second or third in command at the Sheriff's Office, it is not evidence that the Chief of Staff was aware of an employee's testimony at his wife's arbitration.[3] In fact, the document states that the Department of Corrections employs approximately 3,500 sworn and civilian staff members, which would seem to

---

[2] Towne's resume does not appear in the record at the citation provided in Consolino's brief. Instead, there is a single page containing two lines. The first reads, "Exhibit 55," and the second states, "Brian Towne's publicly posted resume." Consolino also provides in his brief an internet address for Towne's resume but the link is no longer active. Consolino cites the resume for the proposition that Towne, the Sheriff's Chief of Staff, was second in command at the Sheriff's office. But that fact does not give rise to a reasonable inference that Towne was aware of Consolino's testimony at his wife's arbitration.

[3] Consolino also cites a memorandum to Towne from the commander of the General Investigations Section requesting that nineteen detective-level vacancies be filled. Consolino contends that this is evidence that Towne was involved in approving transfers. We do not doubt that Towne, as Chief of Staff, was involved in personnel decisions involving large numbers of employees, but the question here is whether Towne was aware that Consolino testified at his wife's *Shakman* arbitration. Towne's involvement in generally authorizing the filling of nineteen vacancies provides no reasonable inferences regarding Towne's knowledge of Consolino's *Shakman* testimony.

make it *less* likely that the Chief of Staff would be aware of the identity of witnesses at arbitration hearings, much less the content of their testimony. Consolino also cites evidence that Towne was annoyed with him for talking to the Sheriff directly during his visit to the Boot Camp, but again, this evidence lacks any link to Consolino's testimony at his wife's *Shakman* hearing.[4]

That leaves Egan, whom Consolino claims should have remedied the situation once he became aware that Consolino was being denied the FBI transfer because of his testimony at the *Shakman* arbitration (which, of course, presumes that the testimony was the motivation behind the decision). But the record shows only that Egan discussed Consolino's request with Ways, that Ways spoke to the FBI, that Ways then told Egan that the offer had been rescinded by the FBI, and that Egan conveyed that message to Consolino. Consolino subsequently filed a complaint with the Office of Professional Review and specifically requested that Egan not be involved in the investigation. None of this indicates that Egan had any involvement in a decision to deny Consolino an assignment to the FBI task force. On the contrary, as the district court con-

---

[4] We also reject Consolino's suggestion that the court drew an improper inference against Consolino based on his wife having a different last name. Rather, the court noted that Consolino produced no documents or internal memoranda mentioning the arbitration that could have put Dart or Towne on notice of the hearing. The court further remarked that, even if such a document existed, Consolino's wife has a different last name and a document related to her alone would not have put the reader on notice that Consolino was involved in any way. This was simply an appropriate refusal to draw an inference based on speculation in favor of Consolino.

cluded, the evidence indicates that Egan was not in a position to do anything for Consolino once he conveyed the message that the FBI had rescinded the offer. *See Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) (a damages suit under section 1983 requires that a defendant be personally involved in the alleged constitutional deprivation). Without any personal involvement, Egan cannot be held liable under section 1983.

Consolino's only remaining claim is that the defendants transferred him from the Boot Camp to Division XI in retaliation for filing a complaint with the Office of Professional Review. The district court granted judgment in favor of the defendants on this claim after concluding that Consolino lacked any evidence that any of the defendants were personally involved in the decision to transfer him. Consolino "concedes that his evidence as to the transfer to Division XI is not the strongest." Plaintiff's Opening Brief, at 24. He cites no evidence that any of the defendants were personally involved in the decision to transfer him to Division XI.[5] Because Consolino did not demonstrate that the defendants were

---

[5] Nor does he cite any evidence that the job in Division XI was inferior to his position at the Boot Camp. He does not assert that he was demoted, or paid less or that his work duties changed in any significant manner. In general, an employment action meets the standard for retaliation if it is materially adverse in the sense that it well might dissuade a reasonable worker from engaging in protected conduct. *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). Consolino has supplied no evidence that the lateral transfer from one division of the county jail to another met this standard.

personally involved in the decision to transfer him, the district court correctly granted judgment in favor of the defendants.

AFFIRMED.