In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 19-2723

SACHIN GUPTA,

*Plaintiff-Appellant,*

*v.*

CHAD MELLOH and
CITY OF INDIANAPOLIS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-00427-JRS-DLP — **James R. Sweeney II**, *Judge.*

_____

ARGUED SEPTEMBER 17, 2020 — DECIDED DECEMBER 6, 2021

_____

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges.* \*

ROVNER, *Circuit Judge.* In the process of arresting a highly
inebriated Sachin Gupta, a police officer tugged on his

_____

\* Former Circuit Judge Barrett was a member of the panel that heard
arguments in this case. Upon her appointment to the Supreme Court, Jus-
tice Barrett was replaced by Judge Rovner, who reviewed the briefing, the
record, and a recording of the oral arguments.

handcuffed arm causing him to fall forward on his head and
chest and fracture a vertebra in his neck. The officer asserts
that he used a reasonable amount of force on a suspect who
was resisting arrest. Gupta asserts that the use of force was
excessive given that he was not resisting the arrest, and also
intoxicated, unsteady on his feet, and handcuffed with his
hands behind his back. As these conflicting accounts make
clear, there are material disputes of fact that make resolution
of this case on summary judgment inappropriate. We there-
fore reverse and remand to the district court for the appropri-
ate fact finder to determine which version of the facts might
prevail.

## I.

Sachin Gupta drank too many alcoholic beverages on a
business trip and found himself extremely intoxicated and
struggling to use his key to open the lobby door of the Micro-
tel Inn in Indianapolis. The problem, however, was not with
the key card to the hotel, but with the fact that Gupta was, in
fact, a guest at a different hotel. Frustrated and belligerent,
Gupta began yelling at the front door clerk, who refused to
open the door and instead called the police. Between the time
Gupta first arrived in the vestibule of the hotel and when the
police arrived, he stumbled and wavered back and forth, at
times balancing himself against the wall. At one point, Gupta
stumbled backwards, and a surveillance video shows him ei-
ther throwing or knocking over a brochure rack onto the floor.

Officer Shawn Cook of the Indianapolis Metropolitan Po-
lice Department arrived at the hotel first. Cook noticed the
overturned brochure rack, and that Gupta was unsteady on
his feet, slurring his speech, and needed to hold on to a coun-
ter to keep from falling. It was readily apparent to Cook that

Gupta was highly intoxicated. Gupta complied when Cook asked him to put his hands behind his back and was handcuffed without any resistance, although Cook did need to hold onto Gupta to steady him. Officer Chad Melloh arrived a few minutes after Cook. Gupta was still in the same intoxicated state and swaying unsteadily on his feet when Melloh arrived. When Cook left the vestibule to speak with the hotel clerk, he asked Melloh to supervise Gupta. Melloh later testified that he repeatedly asked Gupta to come outside but Gupta refused and did not move.

At this point, the facts as recited by each party begin to diverge. According to his brief, Melloh walked over to Gupta and placed his right hand on Gupta's left arm and then started to walk toward the front door urging Gupta to come along. Under Melloh's account, Gupta stiffened his body and jerked back away from the officer at which point Melloh concluded that Gupta was resisting arrest and decided to give him a more forceful tug to get him out the door.[1] Gupta, on the other hand, denies that he resisted arrest and asserts that despite his lack of resistance, and the fact that the video does not show him stiffening or jerking his body, Officer Melloh forcefully and unnecessarily jerked Gupta forward.

All parties agree in large part upon what happened next. As Officer Melloh forcefully pulled on Gupta's arm (the amount of that force is contested), Gupta hurtled forward and, without the use of his handcuffed arms to break his fall, hit the floor face-down. Quickly thereafter Officer Melloh

---

[1] Melloh's version of events changes slightly from the probable cause affidavit to his affidavit and deposition submitted to the district court. We briefly detail each iteration of the facts below.

picked up Gupta by the back of the arms and dragged Gupta out to the sidewalk and pulled him up into a seated position on the sidewalk. Melloh asserts that he evaluated Gupta's condition before moving him. Gupta argues that the move occurred immediately, without time for assessment. Photographs taken afterward show blood on the vestibule floor and blood in Gupta's nose and mouth. Gupta sustained a fracture of the C5 vertebra in his neck. He sued Officer Melloh and the City of Indianapolis claiming that Melloh used excessive force in effectuating his arrest.

## II.

### A. The substantive claim of excessive force

The Fourth Amendment prohibits the use of excessive force to seize a person in order to make an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). A court must evaluate whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting that officer. *Graham*, 490 U.S. at 396 (1989). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* "[I]ts proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. And because of this fact-intensive nature of the inquiry, we have noted that "since the *Graham* reasonableness inquiry

nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (internal quotations and citations omitted). In other words, we cannot determine whether Officer Melloh used greater force than was reasonably necessary during an arrest until a fact finder resolves how much force he used and what level of force he needed to use to effectuate the arrest.

This critical inquiry, therefore, requires a resolution of precisely those facts about which the parties disagree. Melloh asserts that Gupta resisted arrest. Gupta says he did not. Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). These credibility disputes are for fact finders to resolve. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

We have seen before the siren song that tempts courts into making factual determinations at the summary judgment phase. *See, e.g., Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) ("[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party."); *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("We must therefore construe the record in the light most favorable to the

nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) ("The temptation is often difficult to resist in cases where the facts and inferences appear to lead more strongly to one conclusion than another."); *Payne*, 337 F.3d at 771 ("[W]e have warned before of falling for the trap of weighing conflicting evidence during a summary judgment proceeding."). But despite our innate draw to truth-seeking, we must resist the allure of fact finding and focus on our one and only task: "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770 (*quoting Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). On summary judgment we must take the facts in the light most favorable to the non-moving party and grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(a).

In reference to the critical disputed moment, in his brief Officer Melloh asserts that "[t]he undisputed designated evidence shows that Gupta resisted Officer Melloh's commands after he was taken into police custody." Melloh Brief at 28. Officer Melloh also argues that "[s]ince Gupta has no memory of what occurred, he relies solely on speculation and conjecture to refute Officer Melloh's testimony." Melloh Brief at 36. Therefore, Melloh asserts that without any evidence from Gupta himself, the only facts that this court can use to form its conclusions must come from the affidavit and the deposition testimony of Melloh which are that Gupta "tensed his

muscles" and "jerked back" when Melloh tried to escort him from the vestibule. Melloh Brief at 35–36. Based on these facts, he concludes, we must affirm Melloh's version of events and grant summary judgment for him. This is simply false. Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the non-moving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources. Although it is certainly true that a court need not give credence to facts based on speculation or conjecture (*see Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021)), in this case, the facts in the light most favorable to Gupta do not come from his conjecture, but rather come from three sources: first, the video evidence; second, Melloh's affidavit, and third, Melloh's deposition testimony. Gupta has satisfied the requirement that he identify specific, admissible evidence showing that there is a genuine dispute of material fact for trial. *See Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).[2]

---

[2] Melloh's brief also claims that Gupta failed to cite to any surveillance video depicting the alleged events, and thus the only designated evidence that establishes what transpired off camera are the deposition testimony and affidavits from Officer Melloh and the hotel clerk, Jan Eweda. *See* Melloh Brief at 22. But Gupta did indeed cite to the surveillance video—by our count, more than forty times, and extensively and specifically cites to these particular events on the surveillance video at page 9 of his brief. *See* Gupta Brief at 5–16. Although it would have been helpful had he repeated the specific page number references in his argument section (as opposed to simply in the fact section), his failure to do so does not mean that the surveillance video evidence is not part of the record evidence that Gupta has presented in his brief.

In addition, Melloh's various claims that Gupta has waived other arguments are based on an overly technical application of waiver. "Waiver

The critical moment on which we must focus lasts only seconds—when Officer Melloh placed his hands on Gupta's arm and pulled him forward. Depending on which version of the story one credits, that pull was either an appropriate and reasonable use of force to subdue an actively resisting suspect or was an unreasonable and excessive use of force against a passive, compliant, intoxicated suspect whom the police made vulnerable to injury by handcuffing his hands behind his back.

Most of the incident was recorded by an audio-less video recorder in the hotel vestibule. See R. 49-18, 49-19. It is true that the video evidence does not hand a slam dunk to either party; the video camera is positioned such that only the top of Gupta's head is visible for a good portion of the video, including the critical moment when Gupta allegedly resisted arrest and when Melloh allegedly used excessive force. Nevertheless, a viewer can see the general movement of the bodies and the immediate aftermath of that movement. A reasonable juror could determine any number of things from that video, including that Gupta did not resist arrest, did not stiffen and jerk backwards, and that Officer Melloh deliberately knocked Gupta to the ground and jumped on top of him. A reasonable jury could also conclude both that Officer Melloh could see visible signs that Gupta was unsteady on his feet, and had other clues that Gupta was impaired. Furthermore, a juror might also conclude that the events occurring on the video did not match Officer Melloh's testimony in his deposition

is not meant as an overly technical appellate hurdle, and the nuances of a litigant's arguments may differ from their stance in the district court without resulting in waiver." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 927 (7th Cir. 2015) (internal quotation omitted).

and affidavit about what happened, or the probable cause affidavit drafted shortly after the event.[3] In short, the video is far from conclusive and reasonable jurors could certainly disagree about what it reveals about the events of the night.

In his brief, Officer Melloh states, "It defies reason to contend that the video depicts Officer Melloh 'forcibly pulling him forward,' when the video only depicts the tops of their heads." Melloh Brief at 21. Yet at oral argument, Melloh's lawyer conceded, "I believe that the video does conclusively demonstrate that Officer Melloh forcibly grabbed Mr. Gupta after Mr. Gupta failed to comply with Officer Melloh's commands to exit the lobby. I don't think there is any dispute about that." Oral argument at 14:00–14:25. And, in fact, based on Officer Melloh's affidavit and testimony, his counsel's conclusion must be correct. For example, in Melloh's affidavit he describes this critical moment as follows:

> I calmly walked back over to Gupta and placed my right hand on Gupta's arm. I then started to walk towards the direction of the front door and said "Come on" [a] couple of times. Gupta stiffened his body and jerked back away from me. At that point, Gupta was actively resisting my commands to leave, so I decided to give him [a] more forceful tug to get him moving towards the door.

---

[3] Although the vestibule video lacks audio, a guest of the hotel recorded a cell phone video recording that includes audio, but lacks any views of Gupta himself. Put together, the audio-less videotape from the vestibule and the visually-lacking audio from the cell phone recording give a fuller account of the situation than either alone. *See* R. 49–20.

R. 49-1 at 2.

In describing this same critical moment in his deposition, he says, "I casually just walked over, and that's when I put my hand on his arm to try to, you know, nudge him to come with me." R. 49-8 at 13. He then describes using his right hand on Gupta's left bicep with

> just a firm hold, but not squeezing real hard and just trying to get him to come with me. I'm nudging him, I'm leaning forward and using my arm to nudge him forward to come with me. I'm trying to make a step. … And he tenses his muscles, you know, flinches, tenses his muscles and doesn't move. I do another lean, another nudge. "Come on, let's go," and that's when he jerks—he jerks back; still being tense, but he jerks in the opposite direction. …And I mean then I realized he was going to be an active resister. He's actively resisting. So then I just gave him another tug, a stronger tug to come with me, a more, you know, "Now we're leaving." … This was more forceful, yes, a lot more forceful.

R. 49-8 at 14-15.

In the video-recorded demonstration that Melloh performed at his deposition, he describes putting his hand on Gupta's bicep and saying "come on let's go" two times while he gently nudges his arm forward. Deposition Video Demonstration at 0:48-0:57; R. 48-21. Melloh describes Gupta jerking backward three times, once more powerfully. *Id.* at 1:11–1:27. These renditions differ slightly from the probable cause affidavit which states, "Officer Melloh advised that Gupta pull

[sic] away from Officer Melloh and he then pulled on Gupta to keep control of him and he then pulled away a second time. … Gupta fell face first on the ground and Officer Melloh was not able to get a firm footing to hold Melloh up." R. 59-4 at 1. In short, the video evidence, which Gupta asserts supports his factual assertions about excessive force, conflicts with Melloh's testimony in a number of ways.

The determination of excessive force may also turn on other material disputes in the case. For example, the parties appear to disagree about Officer Melloh's knowledge of the extent of Gupta's impairment. Because an analysis of excessive force depends on the unique circumstances that a police officer encounters at the time of the arrest, a court might consider whether the officer engaged in action that "would not ordinarily harm an arrestee, [but would] nevertheless cause pain or injury to the particular individual being placed under arrest," for example, one who is inebriated and unsteady on his feet. *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). This inquiry therefore depends on resolving the fact dispute about what Officer Melloh understood about Gupta's level of impairment due to his intoxication.

Melloh's position appears to be that only Officer Cook and not Officer Melloh could have understood the extent of Gupta's intoxication and impairment. Melloh Brief at 20–21. Gupta, however, notes that the surveillance video demonstrates that he was swaying and almost fell when Melloh was standing just in front of Gupta. Gupta Brief at 7 (citing Surveillance Video 2 at 00:36:45-00:38-44; R. 49-18), and that both officers testified that they knew Gupta was intoxicated and that they could not understand what he was saying at times. Gupta also points to Melloh's deposition testimony in which

he admitted that based on his own observations, he concluded that Gupta was intoxicated, explaining that "[a]s soon as I walked in, I definitely smelled the strong odor of an alcoholic beverage, and just his mannerisms and his anger and his outbursts made me believe he was intoxicated on alcohol." R. 49-8 at 11–12.

Thus, to recap, when we take the undisputed facts in the light most favorable to Gupta we have the following scenario: Gupta was highly intoxicated, struggling to keep his balance, handcuffed with his hands behind his back, and standing amidst a floor full of glossy brochures and an overturned brochure rack when Officer Melloh grabbed his arm with one hand and forcibly tugged him forward causing him to fall and fracture his neck. Here we have essential material facts in dispute: Gupta asserts that he was not resisting arrest and that the extent of his impairment was obvious. Melloh alleges that Gupta was resisting arrest and that he had no reason to know how unsteady he was, and thus the level of force he used to move him was reasonable in light of the circumstances.

The district court thus erred when it concluded that Gupta was non-compliant and that Melloh's force was "minimal." R. 86, Order at 6, 8. These were contested factual determinations. We can conclude, therefore, that summary judgment is inappropriate in this case where there are disputes of material fact about the level of force used and the amount of force necessary that are essential to the question of the reasonable use of force.[4]

---

[4] The parties also dispute whether the training Melloh received on how to treat intoxicated, back-handcuffed suspects is relevant to the district court's determination of the substantive claim of excessive force or

## B. Qualified Immunity

For this same reason, it is impossible to conclude on summary judgment whether Melloh was entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages in situations in which their conduct does not violate a clearly established statutory or constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity under § 1983 extends to police officers unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). We need not consider the prongs in order. *Pearson*, 555 U.S. at 236. "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In order to be "clearly established, there need not be a case directly on point but existing precedent must make the question beyond debate." *Rivas-Villegas v. Cortesluna*, No. 20-1539, 2021 WL 4822662, at *2 (U.S. Oct. 18, 2021). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). In other words, in the Fourth Amendment context, an officer will have to determine "how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018) (finding that it was far from obvious that shooting an erratic woman swinging a

---

the determination of qualified immunity. We find it unnecessary to resolve that question.

large kitchen knife near others would violate the Fourth Amendment).

As the Supreme Court noted, its Fourth Amendment jurisprudence recognizes that some amount of physical coercion might be necessary in order to effectuate an arrest, but that "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396–97. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela*, 138 S. Ct. at 1152 (*quoting Graham*, 490 U.S. at 396–97). "[I]n an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199. But ordinarily, as we noted, the result "depends very much on the facts of each case." *Id.* at 201.

In this case, the crime was not at all severe; it involved public drunkenness. Gupta was loud and obnoxious, and perhaps had caused some mess and disorder in the lobby, but he had quickly and readily succumbed to handcuffing. Gupta did not pose a threat to the officers or others—he was handcuffed with his hands behind his back and there was no one in the immediate vicinity. There was no immediate need to move him, and no split-second judgment was required. The circumstances were not tense, uncertain, or rapidly evolving. It was almost one o'clock in the morning when the events

occurred, and although a pizza delivery team arrived to deliver pizza, the entrance to the hotel was otherwise empty. Officer Cook had just stepped inside to talk with the front desk clerk and would have been available within minutes to help escort Gupta. No crowd had gathered; Gupta was not threatening violence; there were no environmental factors making it important to vacate quickly. And, most critically, according to Gupta, he was not evading arrest.

The evaluation of qualified immunity therefore requires the same assessment of the material fact at issue in this case on the substantive claim of excessive force. It "requires careful attention to the facts and circumstances" of the situation in which Officer Melloh found himself, including, the severity of the crime and how much of a risk Gupta posed to himself, the officer, and others, and most importantly for our purposes, it includes an assessment of whether Gupta was actively resisting arrest. *Graham*, 490 U.S.at 396. Our case law has long put police officers on notice that they "do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever," *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996), and that significant force is unreasonable after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014). But in this case, we have no concessions about the facts of provocation or resistance that would allow us to determine reasonableness as a matter of law.

## C. Allegations of a falsified affidavit

The district court also granted summary judgment to Melloh on Gupta's claim that Melloh violated his Fourth Amendment rights by falsifying allegations in the probable

cause affidavit. The district court called this a claim for "unreasonable prosecution." Melloh refers to it as a "malicious prosecution" claim. We have noted that after the Supreme Court case in *Manuel*, "'Fourth Amendment malicious prosecution' is the wrong characterization. There is only a Fourth Amendment claim—the absence of probable cause that would justify the detention." *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018) (*citing Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911, 917–20 (2017)).

The briefing and discussions of this claim are a bit muddled, perhaps because the law on malicious prosecution was evolving in the Supreme Court and in this court just as this case was progressing. *See id.* Nevertheless, we can boil our conclusions down to a few simple observations. First, the Supreme Court decision in *Manuel*, makes clear that a plaintiff can bring a Fourth Amendment claim for unlawful detention either before or after the start of the legal proceedings. *Manuel*, 137 S. Ct. at 918–19. Second, falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment. *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (*citing Franks v. Delaware*, 438 U.S. 154 (1978)).

It should be clear by this point that however this claim is framed, it also cannot be decided on summary judgment. We cannot determine whether Melloh violated Gupta's Fourth Amendment rights unless we know whether he falsified the evidence needed for the probable cause determination, and that, in turn, depends on resolution of a contested factual dispute—whether or not Gupta resisted arrest. As we have concluded, that is a material disputed fact to be resolved at trial.

**D. State law battery claim**

Our conclusions thus far should make our last determination equally obvious. Indiana's excessive force standard effectively parallels the federal Fourth Amendment. *See O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000); *Walsh v. City of Michigan City*, No. 3:19-CV-419 DRL-MGG, 2021 WL 1854378, at \*4 (N.D. Ind. May 10, 2021); *Bowden v. Town of Speedway, Ind.*, 539 F. Supp. 2d 1092, 1110 (S.D. Ind. 2008); *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006). The Indiana Supreme Court has held that because the Indiana Code limits police officers to using only the force that is reasonable to effectuate an arrest, an officer's use of excessive or unreasonable force is not shielded from liability or subject to immunity under the Indiana Tort Claims Act. *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010). The state law battery claim rises or falls on the resolution of the same disputed material facts as the federal claim. For this reason, we REVERSE and REMAND for further proceedings before the district court.